**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO. 5:20-cv-00279-TES** |
| **CVB INDUSTRIAL CONTRACTING, INC., and SELECTIVE WAY INSURANCE COMPANY,** | |
| *Defendants.* | |

**ORDER[1]**

  This is an insurance coverage dispute with several moving parts. For right now, though, let's just lay out the claims. Plaintiff Travelers Property Casualty Company of America asserts claims for contractual indemnity, common law indemnity, and breach of contract against CVB Industrial Contracting, Inc.; claims for breach of contract and contribution against Selective Way Insurance Company; and a claim for equitable

---

[1] With the parties' consent, the Court terminated CVB Industrial Contracting, Inc.'s, Motion for Summary Judgment [Doc. 61]; Selective Way Insurance Company's Motion for Summary Judgment [Doc. 62]; Travelers Property Casualty Company of America's Motion for Summary Judgment [Doc. 73]; Travelers Property Casualty Company of America's Motion to Exclude Expert Testimony [Doc. 69]; and Travelers Property Casualty Company of America's Objection/Motion to Strike [Doc. 97] pending mediation. [Doc. 100]. The parties were unsuccessful in their medication efforts, so the Court **REVIVES** the foregoing motions sua sponte and issues this Order. If the Court's rulings rekindle the parties' mediation efforts, they should complete any future mediation in advance of the trial date listed at the conclusion of this Order.

subrogation against both CVB and Selective Way. [Doc. 32, pp. 9–14]. All three parties seek summary judgment, but the Court needs to first address a couple of housekeeping matters before it delves into the more intricate questions concerning whether any of Travelers' six claims will proceed to trial.

First, Local Rule 7.4 is a short and simple rule setting the page length for briefs. It states, in relevant part:

> Except upon good cause shown and leave given by the court, all briefs in support of a motion or in response to a motion are limited in length to twenty (20) pages; the movant's reply brief may not exceed ten (10) pages. . . . A party seeking permission to exceed these limitations shall do so by filing a written motion no later than five (5) days in advance of the deadline for filing the brief . . . and by specifying the number of pages requested.

LR 7.4, MDGa.

Selective Way followed this straightforward rule when it asked to exceed the 20-page limit for its brief in support of its summary-judgment motion. [Doc. 59]. And, when the Court granted Selective Way's request, it proactively gave all three parties permission to file 25-page summary-judgment motions and responses—five pages more than the limit set by Local Rule 7.4. [Doc. 60]. The Court, however, unequivocally denied any page extension for any reply briefs. [Doc. 60 ("Any reply will be limited to 10 pages.")]. After reviewing CVB and Selective Way's response briefs in opposition to its summary-judgment motion, Travelers decided that it needed more than the allotted ten pages to reply. [Doc. 90, ¶¶ 2, 4]. So, like Selective Way for its summary-judgment motion, Travelers requested a page extension for is reply brief. [*Id.* at ¶ 4]. The Court,

however, denied Travelers' request, noting that it "previously limited all repl[y] [briefs] to [ten] pages." [Doc. 91].

As any court would expect when it issues neat, basic, and elementary rulings that lack any need of interpretation and are virtually incapable of misinterpretation, Selective Way and Travelers filed reply briefs that were, substantively, ten pages long—excluding the attorneys' signature block and their certificates of service. [Doc. 92, pp. 1–10]; [Doc. 94, pp. 2–11]. CVB, though, apparently either missed, forgot about, or just flat-out ignored Local Rule 7.4 and the Court's two previous rulings limiting reply briefs to ten pages. Without any explanation and without the slightest effort to comply with Local Rule 7.4, CVB filed a 16-page reply brief in support of its summary-judgment motion—excluding its attorney's signature block and his certificate of service. [Doc. 93, pp. 1–16]. Wanting to make sure that everyone is being fair and playing by the same rules, Travelers rightfully objected to CVB's wayward reply brief and moved to strike it from the record. [Doc. 97, pp. 1–2].

In response, CVB tells the Court that it "unintentionally exceeded" the page limit. [Doc. 98, p. 2]. But, given the Court's crystal-clear orders limiting reply briefs to 10 pages, it's not too convinced. Unintentional or not, the Court posts its local rules on its website, and it goes without saying that every party must comply with them. Even assuming CVB somehow didn't know about the page length for reply briefs, once Travelers filed its motion calling it out for the violation, one would think that CVB

would have immediately just withdrawn its 16-page reply brief and substituted a rule-compliant 10-page reply brief in its place. Unfortunately, that's not the course of action CVB chose. To this day, CVB hasn't taken a single step to rectify its violation of Local Rule 7.4 and of not one, but two, unambiguous rulings from the Court. The Court certainly doesn't get the luxury of ignoring its rules, and neither will CVB. Since CVB chose to not follow the Court's rules and orders, the Court, in exercising its broad discretion, simply quit reading when it got to the tenth page of CVB's reply brief. Consequently, it didn't consider any of CVB's arguments made from page 11 through page 16 to determine whether CVB is entitled to summary judgment. *See Freeman v. Sample*, 814 F. App'x 455, 460 (11th Cir. 2020). CVB's trouble with the Local Rules though, unfortunately, didn't stop there.

Local Rule 56 states, in relevant part:

> The movant for summary judgment under Rule 56 of the Federal Rules of Civil Procedure shall attach to the motion a separate and concise statement of the material facts to which the movant contends there is no genuine dispute to be tried. Each material fact shall be numbered separately and shall be supported by specific citation to particular parts of materials in the record. Material facts not supported by specific citation to particular parts of materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court.

> [. . .]

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the movant's statement which

are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate. . . .

LR 56, MDGa.

On March 15, 2023, Travelers filed its Motion for Summary Judgment [Doc. 73] against CVB and Selective Way. As required by Local Rule 56, Travelers—as a movant—also filed its Statement of Undisputed Material Facts [Doc. 73-2] contemporaneously with its summary-judgment motion. *Id.* Then, pursuant to an extension of time from the Court, CVB—as a respondent—filed its response brief on April 20, 2023, opposing Travelers' efforts to obtain summary judgment. [Doc. 77]; [Doc. 80]. However, CVB "accidentally neglected" to "attach" its response "to each of [Travelers'] numbered material facts" as required by Local Rule 56. [Doc. 98, p. 2]; LR 56, MDGa. Only after Travelers pointed out "CVB's failure to respond to Travelers' numbered statement of facts" did CVB comply with the Local Rule and get its response to them on the record. [Doc. 94, p. 2 n.1].

To be frank, Travelers isn't wrong to take issue with CVB's missteps. Like Local Rule 7.4, the requirements of Local Rule 56 are readily available and easy to understand, and the Court ought to be able to expect compliance—especially from parties represented by counsel—without devoting its limited time and resources to dealing with parties who won't follow the rules. For some reason, though, CVB just couldn't quite live up to that minimal expectation. As Local Rule 56 requires, CVB's response to

Travelers' statement of facts was supposed to be "attach[ed]" to CVB's response to Travelers' summary-judgment motion—not filed nearly a month later. LR 56, MDGa. Not only was CVB egregiously late in filing its response to Travelers' statement of facts, but CVB filed it a week after the briefing on the issues for Travelers' summary-judgment motion closed. Once more, to ensure fair play for all parties involved, Travelers has asked the Court to exercise its discretion to disregard and strike CVB's response to its statement of facts. [Doc. 97, pp. 2–4]. Astoundingly, when CVB responded to Travelers' efforts to strike its non-compliant filings, CVB took the unfettered opportunity to double-down and inject additional substantive arguments on the merits of this case. [Doc. 98, pp. 4–18]. Candidly, the length of that response doesn't violate Local Rule 7.4 when it comes the regular 20-page limit for response briefs, in general. LR 7.4, MDGa. However, with the additional merit-based arguments CVB tried to sneak onto the record—arguments that the Court obviously didn't consider—CVB's summary-judgment arguments effectively span across three different briefs and some 50 pages in total. *See, e.g.,* [Doc. 61-1, pp. 1–19]; [Doc. 93, pp. 1–16]; [Doc. 98, pp. 4–18]. Now, that just doesn't seem fair since Travelers and Selective Way only got 35 pages. The Court cannot express just how wholly unacceptable this is.

As should be absolutely clear, the Court in no way condones CVB's sloppy and underwhelming rule-following practices. Nevertheless, the Court will not disregard CVB's ill-timed response to Travelers' statement of facts. *See Quick v. Peoples Bank of*

*Cullman Cnty.*, 993 F.2d 793, 799 (11th Cir. 1993) ("[A] compulsory exercise of discretion is not discretion at all."). From the Court's seat, it seems a much better practice to decide which of Travelers' claims, if any, a jury will hear upon a carefully considered determination of the merits of this case rather than by means of a procedural technicality. Accordingly, for the reasons discussed above, the Court **PARTIALLY OVERRULES** Travelers' Objection to CVB's Non-Compliant Filings [Doc. 97] and **GRANTS in part** and **DENIES in part** Travelers' requests to strike as discussed above. With that, let's get to what this case is about.

## BACKGROUND

Kaolin is a white clay used to make paper. For more than 30 years, CVB provided contract labor for kaolin mill operators like Thiele Kaolin Company out of Sandersville, Georgia. CVB provided employees to work on Thiele's premises to bag and vacuum clay, wash railcars, and clean equipment. Although Thiele provided gas monitors and other equipment, Travis Barnes, CVB's employee, asphyxiated after entering an oxygen-deficient railcar at Thiele's facility on July 15, 2015. Sixteen months after Barnes' death, his mother filed a wrongful death suit in the Superior Court of Washington County, Georgia, against Thiele and four other defendants—none of which was CVB. Following Thiele's demand, its insurer, Travelers, provided a defense. Barnes' mother later dismissed that lawsuit, refiled it in a Pennsylvania state court, and then settled with Travelers for $5 million.

Before reaching this settlement, though, Travelers reached out to CVB's insurer, Selective Way. However, Selective Way denied coverage on the basis that there wasn't a written contract or agreement between CVB and Thiele designating Thiele as an additional insured under the policies issued to CVB by Selective Way. Believing to the contrary, Travelers seeks indemnification from Selective Way.

Although short, those facts lay out the general premise of this case, but there are several documents relied upon by the parties in discussing the viability of Travelers' claims.

### 1.      The 2008 Indemnification Agreement

First, on January 31, 2008, CVB and Thiele executed an Indemnification Agreement that was to "remain in force and effect through the duration of the time that any leased employee of [CVB] provide[d] services to [Thiele]." [Doc. 45-3, p. 2]; *see* [Doc. 62-2, ¶ 12] *in connection with* [Doc. 86-1, ¶ 12]. In this contract, however, CVB "agree[d] to indemnify, defend[,] and hold [Thiele] harmless from and against any and all state or federal claims, causes of action, liabilities, fines, judgments, and expenses . . . of any nature whatsoever . . ." without regard to any partial negligence from CVB. *Compare* [Doc. 45-3, p. 2], *with* [Doc. 73-9, ¶ 5.11].

### 2.      The Master Agreement

In addition to the 2008 Indemnification Agreement, there's a separate contract between CVB and Thiele called the "Master Agreement" which Carl Brookins, CVB's

owner and chief executive officer, signed on behalf of CVB on February 1, 2008. [Brookins Rule 30(b)(6) Depo., p. 12:8–16]; *see generally* [Doc. 73-9]. The parties hotly dispute the purpose of this contract. *Compare* [Doc. 73-2, ¶ 8], *with* [Doc. 89-1, ¶ 8] *and* [Doc. 96, ¶ 8]. Travelers takes a broader position and argues that CVB and Thiele intended for it to govern "any Project identified in a Purchase Order or Work Order." [Doc. 73-2, ¶ 8]. Selective Way and CVB see things a little differently. They argue that the Master Agreement was "to govern construction work, not services like the washing of railcars." [Doc. 89-1, ¶ 8]; *see also* [Doc. 96, ¶ 8 (noting that the Master Agreement was not "intended to govern work by CVB employees such as washing railcars[]")].

Obviously, the initial hurdle is to determine exactly what the Master Agreement covers. "Under Georgia law, '[w]here the terms of a contract are plain and unambiguous, the construction of the contract is a question of law' and is 'particularly appropriate for summary [judgment].'" *Sims v. Taylor*, 270 F. App'x 940, 944 (11th Cir. 2008) (quoting *Garvin v. Smith*, 520 S.E.2d 863, 864 (Ga. Ct. App. 1999)). Looking to the language of the Master Agreement, it's exceedingly clear that it "govern[s] . . . *any* Project identified in a Purchase Order or Work Order." [Doc. 73-9, ¶ 1.2 (emphasis added)]. Although sweepingly broad, it doesn't get any plainer and more unambiguous

than that.[2]

The Master Agreement also included indemnity requirements that obligated

CVB to

> indemnify, defend, and hold [Thiele] harmless from and against any claims,
> damages, losses, and expenses . . . but only to the extent [such claims,
> damages, losses, and expenses are] caused in whole or in part by the
> negligent acts or omissions, breach of contract, or violation of law by [CVB],
> its subcontractors, or anyone directly or indirectly employed by them or
> anyone for whom they may be liable, regardless of whether or not the claim,
> damage, loss, or expense is caused in part by [Thiele].

[*Id.* at ¶ 5.11].

Despite being signed one day apart, notably absent from either the 2008

Indemnification Agreement and the Master Agreement is any mention of a merger

clause, and under Georgia law, "[o]ne simple contract does not merge or extinguish

another." *Adeduntan v. Hosp. Auth. of Clarke Cnty.*, No. 3:04-CV-65 (CDL), 2006 WL

1934872, at *5 (M.D. Ga. July 11, 2006) (quoting *Bowen v. Budd*, 297 S.E.2d 334, 336 (Ga.

Ct. App. 1982)). Here, neither contract "contain[s] a merger clause or other provision

reflecting that it was intended to be the entire agreement between the parties[]";

therefore, the "former agreement did not merge into the subsequent one[.]" *Jones v.

Baran Co.*, 660 S.E.2d 420, 424 (Ga. Ct. App. 2008); *Adeduntan*, 2006 WL 1934872, at *5.

---

[2] Even assuming, *arguendo*, that CVB and Thiele intended the Master Agreement to limitedly govern construction, Brookins testified that he has "construction people that come in and wash out tanks and vacuum up clay and clean out equipment also." [Doc. 73-7, p. 5, Brookins Depo., p. 12:18–20]. Therefore, logic dictates that cleaning railcars falls underneath construction.

### 3.      The 2015 Purchase Order

And, on top of those two contracts, CVB, in a Purchase Order dated January 1, 2015, also said that it would indemnify Thiele and agreed to "defend, protect[,] and hold [Thiele] harmless . . . from and against any and all losses, damages, injuries (including death), claims, demands, expenses[,] and legal fees, of whatever nature[.]" [Doc. 73-13, p. 5].

## <u>LEGAL STANDARD</u>

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ.

P. 56(c)(1)(A).[3] "When the *nonmoving* party has the burden of proof at trial, the moving

party is not required to 'support its motion with affidavits or other similar material

*negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four*

*Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party

simply may show—that is, point out to the district court—that there is an absence of

evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38

(quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide

"affirmative evidence demonstrating that the nonmoving party will be unable to prove

its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party,

who must rebut the movant's showing "by producing . . . relevant and admissible

evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not

significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*,

477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's

position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as

---

[3] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact

undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for
> trial. Rather, on summary judgment, the district court must accept as fact
> all allegations the [nonmoving] party makes, provided they are sufficiently
> supported by evidence of record. So[,] when competing narratives emerge
> on key events, courts are not at liberty to pick which side they think is more
> credible. Indeed, if "the only issue is one of credibility," the issue is factual,
> and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible

inferences creates a genuine issue of material fact, a court cannot grant summary

judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at

1263.

<u>**SELECTIVE WAY'S MOTION FOR SUMMARY JUDGMENT**</u>

Selective Way contends that there are "at least three reasons[]" why it doesn't

have to indemnify Travelers. [Doc. 62-2, p. 2]. First, Selective Way argues that under the insurance policy it issued to CVB, "a third party like Thiele" can only be an additional insured if CVB executed a contract requiring Thiele to be characterized as such. [*Id.* at pp. 2, 9–11]. Next, under its interpretation of the "Master Agreement," one of the documents at issue in this case, Selective Way says that Travelers can't rely upon the Master Agreement to characterize Thiele as an additional insured. [*Id.* at pp. 2–3, 11–20]. And third, Selective Way argues that even if Travelers could rely on the Master Agreement, it doesn't apply because when CVB and Thiele executed the Master Agreement in 2008 they intended it to cover construction work—not washing railcars—on Thiele's property.[4] [*Id.* at p. 3].

### 1.   <u>The Master Agreement</u>

Before reaching the merits of Selective Way's arguments regarding the Master Agreement, the Court first notes an issue not pressed by the parties. Selective Way is

---

[4] The Master Agreement clearly states that "[t]he term 'Work' as used in this Agreement means the construction, services, labor, and material required by the Contract Documents for each Project, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by [CVB] to fulfill [CVB's] obligations." [Doc. 73-9, p. 3]. From this, the Court flatly rejects Selective Way's third argument because Brookins testified that when he signed the Master Agreement "it was about bagging clay" and CVB "putting people at Thiele[] [to] bag[] clay"—an activity that appears more related to washing railcars than to construction. *See* [Doc. 73-11, p. 16, Brookins Rule 30(b)(6) Depo., p. 55:9–11] *in connection with* [Doc. 73-7, p. 5, Brookins Depo., p. 12:18–20 (Brookins testimony that he has "construction people that come in and wash out tanks and vacuum up clay and clean out equipment also[])"]. Selective Way clings to the fact that "the Master Agreement never once mentions railcars or cleaning services." [Doc. 62-1, pp. 19–20]. Coincidentally, however, the Master Agreement also fails to mention clay—the supposed reason Brookins signed that contract in the first place.

not a party to the Master Agreement, so it doesn't have standing to challenge its

validity.[5] "[A] person who is not a party to a contract, or an intended third-party

beneficiary of a contract, lacks standing to challenge or enforce a contract under Georgia

law." *Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246, 1251 (11th Cir. 2015); *Breus v.*

*McGriff*, 413 S.E.2d 538, 539 (Ga. Ct. App. 1991) ("Appellants are strangers to the

assignment contract between appellee and Habersham and thus have no standing to

challenge its validity."); *Haldi v. Piedmont Nephrology Assocs., P.C.*, 641 S.E.2d 298, 300

(Ga. Ct. App. 2007); *cf. In re Vallecito Gas, LLC*, 771 F.3d 929, 934 (5th Cir. 2014); Order,

*Ray Cap. Inc. v. M/V Newlead Castellano, IMO No. 9686338*, No. CV 416-093 (S.D. Ga. Nov.

18, 2016), ECF No. 109 ("A stranger to a contract generally lacks standing to challenge

the validity of that contract or otherwise advance any defenses on behalf of the parties

thereto."). Put another way, "only a party . . . to a contract can challenge its validity[.]"

*In re Vic Supply Co.*, 227 F.3d 928, 929 (7th Cir. 2000). "Obviously[,] the fact that a third

party would be better off if a contract were unenforceable does not give him standing . .

. to void the contract." *Id.* at 931.

    Accordingly, because Selective Way is not a party to any of the agreements

between CVB and Thiele, Selective Way cannot challenge their validity. Even if the

Court is incorrect on this issue of contractual standing, Selective Way's attempts to

---

[5] "Standing" in this context refers to statutory or contractual standing—not Article III jurisdictional standing. *See, e.g.*, *SFR Servs., LLC v. Indian Harbor Ins. Co.*, 529 F. Supp. 3d 1285, 1292 (M.D. Fla. 2021); *Steely v. Allstate Indem. Co.*, No. 1:11-CV-517, 2012 WL 13026848, at *3 (S.D. Ohio July 9, 2012).

invalidate the contracts in this case fail for the reasons discussed below.

### A.    Waiver

Selective Way argues that Travelers waived its right to rely on the Master Agreement because Travelers and Thiele "waited almost seven years to bring the Master Agreement to Selective's attention." [Doc. 62-1, p. 17]. Selective Way relies on Georgia case law that instructs courts to "infer waiver where a party's acts or omissions are so manifestly consistent with an intent to relinquish a then-known particular right or benefit[.]" *Wallace v. Wallace*, 813 S.E.2d 428, 435 (Ga. Ct. App. 2018). However, waiver doesn't operate to benefit Selective Way in this case.

First, only parties to a contract may waive its terms. *Cho v. S. Atlanta Assocs., Ltd.*, 409 S.E.2d 674, 676 (Ga. Ct. App. 1991) ("It is equally well recognized that *a party to a contract* may waive contractual provisions for his benefit.") (emphasis added). It is undisputed that Travelers is not a party to the Master Agreement. So, Travelers couldn't have waived its terms. Selective Way's summary-judgment motion makes much of Travelers' actions as evidence of waiver, but for the purposes of the Master Agreement, Travelers' actions are irrelevant.

Second, and more importantly, the Master Agreement itself forecloses Selective Way's waiver argument. The Master Agreement reads, in pertinent part,

> No provision of this Master Agreement shall be deemed to be waived and no breach shall be deemed excused unless such waiver or consent is in writing and signed by the party claiming to have waived or consented. No

consent by other party to, or waiver of, a breach of the other, whether express or implied, shall constitute consent to, waiver of, or excuse for any different or subsequent breach.

[Doc. 73-9, ¶ 8.3]. Although "a contractual provision against waiver may be waived by conduct," Selective Way failed to produce evidence showing that Thiele "intentional[ly] relinquish[ed]" its rights under the Master Agreement. *Crawford v. First Nat. Bank of Rome*, 223 S.E.2d 488, 490 (Ga. Ct. App. 1976); *Yash Sols., LLC v. N.Y. Glob. Consultants Corp.*, 834 S.E.2d 126, 133 (Ga. Ct. App. 2019). Absent such evidence, there's no indication that Thiele waived this specific provision of the Master Agreement.

Regardless, in Georgia "waiver [of a contract] is not favored under the law," and the intent of the party allegedly waiving the agreement must be so clear as to "exclude any other reasonable explanation." *J.P. Carey Enter., Inc. v. Cuentas, Inc.*, 864 S.E.2d 588, 598 (Ga. Ct. App. 2021). Selective Way cannot meet that high burden on the record before the Court, making waiver an inappropriate basis for summary judgment. *See Sw. Plaster & Drywall Co. v. R.S. Armstrong & Bros. Co.*, 304 S.E.2d 500, 501 (Ga. Ct. App. 1983) ("Whether the conduct of the parties constitutes a mutual departure from and a waiver of a contract provision ordinarily is a question of fact for the jury.").

## B.  Later-Revealed Facts Doctrine

Selective Way next argues that the "later-revealed facts" doctrine bars Travelers' reliance on the Master Agreement. [Doc. 62-1, pp. 11–12 (citing *Great Am. Ins. Co. v. McKemie*, 259 S.E.2d 39, 40 (Ga. 1979) ("We hold that the correctness of an insurer's

decision to defend or not cannot be determined by 'later-revealed facts' of which the insurer has no knowledge or notice.")]. That argument also fails.

Travelers contends that the "later-revealed facts" doctrine is inapplicable because "the terms of the contractual requirements at issue are not 'facts' but are obligations binding the parties and the existence of a contract is a question of law, not of fact[.]" [Doc. 86, p. 4]. Well, that's not really the relevant inquiry. Whether a purported contract has all the fundamentals to make it legally binding is a separate issue from whether a document literally exists. *APAC-Se., Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373, 1381 (N.D. Ga. 2007). The former is a question of law, and the latter is a question of fact. *Id.*

To that end, the factual existence of the Master Agreement wouldn't have been included in the operative pleading in Barnes' wrongful death suit which is a prerequisite for implicating the "later-revealed facts" doctrine.[6] Rather, the Master Agreement is a binding contract between Thiele and CVB—a relationship that had little to do with the complaints filed in the state court cases. Plus, CVB wasn't even named in

---

[6] "An insurer's duty to defend is determined by 'comparing the allegations of the **complaint** with the provisions of the policy.'" *Cont'l Cas. Co. v. Winder Lab'ys, LLC*, 73 F. 4th 934, 941 (11th Cir. 2023) (quoting *Pilz v. Monticello Ins. Co.*, 599 S.E.2d 220, 221 (Ga. Ct. App. 2004)) (emphasis added).

Moreover, "because insurers under Georgia law have a broad duty to defend when there is 'even arguably' a covered claim . . . the insurers had an active duty to defend up until the point when [a court] ruled otherwise." *Cont'l Cas.*, 73 F.4th at 944 (citing *City of Atlanta v. St. Paul Fire & Marine Ins. Co.*, 498 S.E.2d 782, 784 (Ga. Ct. App. 1998)). The Eleventh Circuit also rejected the argument that the duty to defend "either does or does not exist at the time the complaint" was filed. *Cont'l Cas.*, 73 F.4th at 944 n.14.

the wrongful death suit; therefore, it seems a bit of a stretch to view the Master

Agreement as even relevant to those complaints.

The cases Selective Way cites to support its argument, however, buttress the

inapplicability of the "later-revealed facts" doctrine to the present action. Indeed, each

case qualifies the alleged later-revealed facts as those missing from the operative

pleading, or facts laid out in a complaint that are later determined to be false or

misleading. *See Great Am.*, 259 S.E.2d at 40 ("Great American justifiably refused to

defend based upon the *complaint* it was sent."); *Controlled Blasting, Inc. v. Ranger Ins. Co.*,

484 S.E.2d 47, 49 (Ga. Ct. App. 1997) (quoting *Glens Falls Ins. Co. v. Donmac Golf Shaping

Co.*, 417 S.E.2d 197, 198 (Ga. Ct. App. 1992)) ("The allegations of the *complaint* filed

against [appellee] provide the basis for determining whether liability exists under the

terms of the policy."); *Burt Co. v. Clarendon Am. Ins. Co.*, No. 1:08-CV-165 (WLS), 2010

WL 11519565, at *6 (M.D. Ga. Jan. 26, 2010) ("A duty to defend turns on the language of

the insurance contract and the allegations of the *complaint* asserted against the

insured.").

Based on which companies were named in the wrongful death suit and the

allegations asserted in *that* complaint, Selective Way had to make its decision. Under

Georgia law, it had three choices: defend the claim, deny and refuse, or defend under a

reservation of rights. *Hoover v. Maxum Indem. Co.*, 730 S.E.2d 413, 404–05 (Ga. 2012).

Georgia courts have encouraged insurers to take the "proper and safe course of action"

which is "to enter upon a defense under a reservation of rights and then proceed to seek declaratory judgment in its favor." *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 231 S.E.2d 245, 247 (Ga. 1976). Candidly, when Selective Way refused coverage, it took a risk. *Cf. CSX Transp., Inc. v. Gen. Mills, Inc.*, No. 22-10922, 2023 WL 6474710, at *11, --- F.4th ---- (11th Cir. Oct. 5, 2023). It "wagered that it would never have to cover" CVB, and it took a chance that a document like the Master Agreement didn't exist—but it did. *Barrs v. Auto-Owners Inc. Co.*, No. 5:19-cv-00494-TES, 2022 WL 17905535, at *4 (M.D. Ga. Sept. 21, 2022).[7] Rather than seek a declaratory judgment to determine its rights and obligations, Selective Way chose not to defend. Consequently, it cannot now claim that the Master Agreement was somehow relevant to the wrongful death suit and that the underlying parties somehow concealed that contract so that its existence in this case is a later-revealed fact.

Assuming, *arguendo*, that Selective Way is right, and the later-revealed facts doctrine renders its decision not to defend in the underlying suit the correct result, the decision to defend in the underlying litigation is a different question from indemnification now. As the Georgia Supreme Court noted, the "duty to defend and the duty to pay are independent obligations." *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Pol'y Nos. TO31504670 & TO31504671*, 491 S.E.2d 337, 339 (Ga. 1997);

---

[7] As the Eleventh Circuit recently noted, the "duty to defend is extremely broad under Georgia law." *Cont'l Cas.*, 73 F.4th at 948.

*Cont'l Cas.*, 73 F.4th at 948 n.19 (applying Georgia law to conclude that "the duty to defend and the duty to indemnify . . . are separate and independent obligations."); *cf. Trizec Prop., Inc. v. Biltmore Const. Co.*, 767 F.2d 810, 812 (11th Cir. 1985) ("The duty to defend is separate and apart from the duty to indemnify[.]"). The pertinent question in this case is whether Selective Way must indemnify and pay Travelers *now*—in light of the Master Agreement. The answer to that question rests in the evidence and facts of *this* case, not the evidence or facts of the underlying litigation. Once again, Selective Way could have taken the "procedurally safe course" of defending under a reservation of rights, and then asking a court to decide both its duty to defend and duty to indemnify in one action. *ALEA London Ltd. v. Woodcock*, 649 S.E.2d 740, 747 (Ga. Ct. App. 2007). It did not take that course. Therefore, it cannot use its inaction in the wrongful death suit as a shield in this case—a case with facts that simply make the situation different.

### C.   Abandonment

Selective Way also argues that Thiele and CVB abandoned the Master Agreement. In Georgia, "[p]arties may by **mutual consent** abandon an existing contract between them so as to make it not thereafter binding[.]" *Brooks v. Boykin*, 392 S.E.2d 46, 47 (Ga. Ct. App. 1990) (emphasis added). Put another way, "Georgia law demands that both parties actively and unambiguously disaffirm [a] contract's continuing validity in order for abandonment to occur." *Progressive Emu Inc. v. Nutrition & Fitness, Inc.*, 655 F.

App'x 785, 791 (11th Cir. 2016); *see also Eaves & Collins v. Cherokee Iron Co.*, 73 Ga. 459, 470 (1885) ("[A]bandonment by both sides would seem to preclude either from complaining of a breach when **both** agreed to quit.") (emphasis added). Moreover, abandonment is a question best left for a factfinder. *See Prothro v. Walker*, 42 S.E.2d 114, 115 (Ga. 1947) ("The question as to whether or not there has been a mutual intention, and in fact a mutual departure from the terms of an original contract, . . . is ordinarily one of fact for determination by the jury.").

Selective Way's primary argument is that neither Thiele nor CVB recalled signing the Master Agreement, or that it even existed, until Thiele produced it in 2022.[8] [Doc. 62-1, p. 14]. However, there are—at best—inconsistencies with this story. First, Brookins testified that the Master Agreement was signed as a contract "about bagging clay" and CVB "putting people at Thiele[] [to] bag[] clay[.]" [Doc. 73-11, p. 16, Brookins Rule 30(b)(6) Depo., 55:9–11]. What's interesting here is that Brookins—who signed the

---

[8] This assertion is also called into question by the testimony of Kenny Trussell—the individual who signed the Master Agreement on behalf of Thiele. [Doc. 73-3, p. 2]. In his affidavit, Trussell confirmed that he signed the Master Agreement in 2008, and that its purpose was to "govern subsequent purchase orders . . . and eliminate the need for a new signed agreement every time Thiele needed to hire CVB for a project." [*Id.*].

CVB—in its response to Travelers' statement of facts—argues that Trussell's affidavit is a "legal sham" and should be disregarded because it contradicts the testimony of Donna Smith. [Doc. 96, ¶ 7]. First, legal arguments should be made in briefs, not responses to statements of facts. *Harris v. Jackson*, No. 1:19-CV-5849-MLB, 2022 WL 4596343, at *1 (N.D. Ga. Sept. 30, 2022). Second, and more importantly, it is a "basic tenet of the 'sham affidavit doctrine' is that a court may disregard an affidavit when it contradicts *that party's* earlier deposition testimony." *Haynes v. Twin Cedars Youth & Fam. Servs., Inc.*, No. 5:10-CV-321 CAR, 2012 WL 895699, at *8 (M.D. Ga. Mar. 15, 2012). Donna Smith's deposition cannot be a basis for condemning Kenny Trussell's affidavit as a sham. Like everything else, it is evidence that a jury can consider to determine whether the parties abandoned the Master Agreement.

Master Agreement on behalf of CVB—testified that he doesn't remember *signing* it but remembers what it was about. On top of that, Brookins testified that CVB did not possess a copy of the Master Agreement—a fact to which he testified without even searching through CVB's records to confirm the absence of *any* contract with Thiele. [Doc. 73-11, p. 14, Brookins Rule 30(b)(6) Depo., pp. 46:23—47:4]. Therefore, it seems inconsistent that Brookins (as CVB's Rule 30(b)(6) representative) affirmed that CVB did not possess the Master Agreement without so much as even looking into his own company's records.

Third, and most importantly, Brookins also testified that he was aware of the Master Agreement "since the time [he] signed it." [Doc. 73-11, p. 14, Brookins Rule 30(b)(6) Depo., p. 49:3–15]. When pushed on the Master Agreement's validity, Brookins insisted that he wasn't "saying that [the Master Agreement] wasn't in effect[,]" just that "[CVB] never found anything on railcar washing." [Doc. 73-11, p. 15, Brookins Rule 30(b)(6) Depo., p. 51:4–6]. Again, when asked if any contract or agreement "cancel[ed] or terminat[ed] this [Master Agreement]," Brookins testified there was none. [Doc. 73-11, p. 14, Brookins Rule 30(b)(6) Depo., p. 49:16–20]. These inconsistencies leave the

factual determinations as to the issue of abandonment to a jury.[9]

The question left for the jury is simple: Did Thiele and CVB abandon the Master Agreement? If they did, then the Master Agreement cannot answer the question of Thiele's status as an additional insured. If they didn't abandon it, then there is a written and signed agreement between CVB and Thiele requiring Thiele to be named as an additional insured, and Selective Way must pay Travelers pursuant to CVB's policy.

### 2.   The 2015 Purchase Order

Selective Way also argues that the 2015 Purchase Order cannot serve as the basis for its liability. [Doc. 62-1, p. 10]. Like the Master Agreement, the 2015 Purchase Order required CVB to "name [Thiele] as an additional insured," and "include a waiver of all subrogation rights against [Thiele]." [Doc. 73-13, p. 5]. Selective Way argues, though, that because the 2015 Purchase Order is not physically signed, it does not meet the

---

[9] Selective Way also argues that the parties to the Master Agreement—*Thiele* and *CVB*—abandoned the contract because *Travelers* filed the instant case in the Middle District of Georgia instead of in the Superior Court of Washington County, as required by the Master Agreement's forum-selection clause. [Doc. 62-1, p. 15]. However, "as a general rule, a party who does not sign a contract is not bound to the terms of that contract." *Elite Storage Sols., LLC v. Sig Sys, Inc.*, No. 1:19-CV-03430-SDG, 2020 WL 10056403, at *3 (N.D. Ga. Mar. 20, 2020). Therefore, Travelers' act of filing in this Court cannot serve as evidence of Thiele and CVB's intent to abandon the Master Agreement.

Additionally, Selective Way asserts that Richard Van Ausdall testified on behalf of Travelers as its Rule 30(b)(6) representative, and he said that Travelers "had no idea [the Master Agreement] was out there [and that he didn't] believe Thiele offered anything about this particular document." [Doc. 62-1, p. 15 (quoting [Doc. 68, p. 5, Ausdall Depo., pp. 16:1—17:4])]. However, Van Ausdall did not represent Travelers in a Rule 30(b)(6) deposition—Mary Thurston Minor did. [Doc. 68]; [Doc. 66]. Even so, Travelers' knowledge about the Master Agreement adds nothing to the abandonment discussion.

definition of "executed" as outlined in CVB's policy. [Doc. 62-1, p. 11].[10]

To support this argument, Selective Way insists that the Court follow *Nationwide Mutual Insurance Co. v. Architechtural Glazing Systems, Inc.*, a case from the Northern District of Georgia. No. 1:13-CV-01069-ELR, 2015 WL 11438555, at *8 (N.D. Ga. Aug. 25, 2015). In *Nationwide*, like this case, the insurance policy in question required a written contract signed by the named insured. *Id.* But to Selective Way's dismay, there's one crucial distinction. *Nationwide* focused on agency principles and **who** can represent and bind an organization to a contract under Georgia law. *Id.* at *8. This case hinges on **what** constitutes a signed contract, not whether the individuals from CVB and Thiele had the capacity to act on their company's behalf.

As to Selective Way's assertion that CVB and Thiele did not physically sign the 2015 Purchase Order, it's right. However, that does not end the analysis. Under Georgia law, "two or more documents can together create a single contract if one of them is referenced by or incorporated into the other." *Harris v. Baker*, 652 S.E.2d 867, 869 (Ga. Ct.

---

[10] CVB's policy with Selective Way requires a "written contract or written agreement [that] has been executed (executed means signed by the named insured)[.]" [Doc. 73-17, p. 221]. However, the policy does not define "signed." Accordingly, under Georgia law, the term "signed" will be given its "widely accepted" meaning. *Empire Fire & Marine Ins. Co. v. Daniels*, 631 S.E.2d 799, 802 (Ga. Ct. App. 2006).

To determine the "widely accepted" meaning, the Court looks to various sources. First, the Uniform Commercial Code (as adopted by Georgia) defines "signed" as "any symbol executed or adopted by a party with present intention to authenticate a writing." O.C.G.A. § 11-1-201(39). Second, American Jurisprudence defines "signature" for purposes of the statute of frauds as "affixing of one's name thereto with the purpose or intent to identify the paper or instrument or to give it effect as one's act." 72 Am. Jur. 2d Statute of Frauds § 247. Third, the Restatement (Second) of Contracts defines it as "any symbol made or adopted with an intention, actual or apparent, to authenticate the writing as that of the signer." Restatement (Second) of Contracts § 134 (1981).

App. 2007). Further, the documents need not be contemporaneous, nor does Georgia law require that both of documents be signed in order to be binding. *James v. Terex USA, LLC*, No. 5:16-CV-60, 2018 WL 6028705, at *6 (S.D. Ga. Nov. 16, 2018).

Here, CVB employees signed various timecards attached to invoices that CVB sent to Thiele. Indeed, each invoice clearly referenced "P.O. #1976," which is the 2015 Purchase Order. [Doc. 73-13]; [Doc. 73-15]. Each timecard notes, "client approval indicates acceptance of the terms and conditions of the **contract**." [Doc. 73-15, p. 3 (emphasis added)]. Additionally, the 2015 Purchase Order contemplates such timecards being submitted every two weeks. [Doc. 73-13, p. 2]. Even more, the 2015 Purchase Order includes a "Complete Agreement" provision integrating "any other document expressly incorporated into this Purchase Order by written agreement of [Thiele] and [CVB][.]" [*Id.* at p. 5].

Selective Way argues that the timecards do not clearly incorporate the 2015 Purchase Order and that the quoted language is "boilerplate." [Doc. 92, p. 3]. However, boilerplate language is not *per se* unenforceable, especially in documents negotiated by sophisticated parties. *See, e.g.*, *JP Morgan Chase Manhattan Bank v. Winget*, 704 F. App'x 410, 420 (6th Cir. 2017) ("This Court will not automatically invalidate boilerplate language between sophisticated parties."); *Dart Indus. Co. v. Westwood Chem. Co.*, 649 F.2d 646, 648 (9th Cir. 1980); *Amoco Rocmount Co. v. Anschutz Corp.*, 7 F.3d 909, 919 (10th Cir. 1993) abrogated on other grounds by *Hertz Corp. v. Friend*, 559 U.S. 77 (2010); *Adams*

26

*v. Merrill Lynch, Pierce, Fenner & Smith*, 888 F.2d 696, 701 (10th Cir. 1989); *United Steel,*

*Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas*

*Corp.*, 531 F.3d 531, 537 (7th Cir. 2008) ("But plain language contained in [an] agreement

cannot be avoided by characterizing it as boilerplate.").

Regardless of whether the language is boilerplate, the timecards clearly reference

terms and conditions of *some* contract. Without a doubt, the language is there, so the

question becomes whether CVB and Thiele intended the timecards to incorporate the

2015 Purchase Order. There are two possible scenarios. First, there is the possibility that

CVB chose to remain ignorant as to what each timecard meant by "terms and

conditions." Second, CVB could have known that the timecards incorporated the terms

and conditions of the 2015 Purchase Order.[11] Either way the timecards could only

incorporate the 2015 Purchase Order.[12]

The Court finds *Henkel Corp. v. Leggett & Platt, Inc.*, highly instructive. No. CIV.A.

---

[11] Brookins confirmed that the invoices and timecards were issued under the 2015 Purchase Order. [Doc. 73-11, p. 23, Brookins Rule 30(b)(6) Depo., p. 83:1–4]. Thus, by its own admission, it appears that CVB knew the 2015 Purchase Order was the "contract" referenced on the timecards.

[12] Additionally, CVB and Selective Way insist that the 2015 Purchase Order is the only document in the current record governing the washing of rail cars during the relevant time period. [Doc. 89, p. 15]; [Doc. 96, ¶ 7]; [Doc. 89-1, ¶ 7]; [Doc. 73-11, p. 17, Brookins Rule 30(b)(6) Depo., p. 60:12–14]. Therefore, it seems inconsistent that Selective Way would now argue that the timecards are referencing some other "contract," which controls Thiele and CVB's relationship as it relates to washing railcars.

More interestingly, Selective Way is the only party that argues the timecard's "contract" reference does not incorporate the 2015 Purchase Order. Not to beat a dead horse, but Selective Way is not a party to any of the contracts between CVB and Thiele; therefore, it is in the worst position to speculate as to the intent of the agreeing parties.

1:09-CV-0463-RLV, 2009 WL 2230813, at *1 (N.D. Ga. July 24, 2009). In *Henkel*, the parties agreed to a purchase order containing separate terms and conditions on the reverse side of the document. *Id.* at *3. However, only after agreeing to be bound by the contract, did the plaintiff realize that the front page of the purchase order referenced terms and conditions that were not included on the one-sided document it received. *Id.* at *1. When the defendant faxed the purchase order to the plaintiff, the terms and conditions included on the reverse side of the document never made it to the plaintiff. *Id.* The plaintiff then argued that the terms and conditions were not a part of the same contract and, therefore, were not binding. *Id.* at *3. The court disagreed. *Id.* Instead, it found that "[w]hat matters here is that the plaintiff had notice that the clearly identifiable Terms and Conditions were incorporated by reference[.]" *Id.* The court continued, opining that "the plaintiff could easily have inquired about the Terms and Conditions," but it didn't, meaning that "the plaintiff's version of the facts would tend to indicate that the plaintiff chose to blindly accept" the blanket terms and conditions. *Id.*

The same logic applies here. CVB and Thiele signed timecards every two weeks. *See, e.g.*, [Doc. 73-15]. Instead of questioning the "terms and conditions" of the "contract" referenced on each and every timecard, CVB apparently blindly accepted them and never inquired into what they were. Just like the unquestioned terms and conditions mentioned in the purchase order in *Henkel*, each timecard signed without CVB ever questioning the specifics of the terms and conditions referenced clearly

incorporate the 2015 Purchase Order and required Thiele to be listed as an additional insured.

Aside from signing the timecards, CVB also sent Thiele a written invoice—on CVB letterhead—explicitly referencing the 2015 Purchase Order. [*Id.*]. Applying Georgia law, courts have found such acknowledgments sufficient to serve as "signatures." *See White v. BAC Home Loans Serv., LP*, No. 2:10-CV-0119-RWS, 2011 WL 4479299, at *7 (N.D. Ga. Sept. 26, 2011) (reviewing various Georgia statutes and determining that under Georgia law, "'signed' is defined to mean 'using any symbol executed or adopted with present intention to adopt or accept a writing.'"). As discussed *supra*, n.10, just because an insurance policy in question may not define "signed," that term is left to the plain meaning and common understanding under Georgia law. Accordingly, based on CVB's actions—its obvious acceptance of the 2015 Purchase Order's terms via typed letterhead invoices and signatures on the accompanying timecards—there is only one conclusion: CVB signed the 2015 Purchase Order for the purposes of Selective Way's policy requirements.

As more support for this conclusion, the Court looks to Brookins' testimony as CVB's Rule 30(b)(6) representative. Brookins testified that "as far as [he] kn[e]w," Thiele was considered an additional insured under CVB's policy with Selective Way. [Doc. 73-11, p. 17, Brookins Rule 30(b)(6) Depo., p. 58:17]. Even more, Brookins testified that CVB did its best to comply with Thiele's requirement that it be listed as an additional

insured, which included purchasing the policy with Selective Way. [Doc. 73-11, p. 17, Brookins Rule 30(b)(6) Depo., p. 59:1–8]. Brookins was also unaware that Selective Way claimed Thiele was not covered as an additional insured under CVB's policy. [Doc. 73-11, p. 17, Brookins Rule 30(b)(6) Depo., p. 59:14–17]. Thus, it seems that CVB's clear intent was to list Thiele as an additional insured.

Selective Way's hyper-technical reading of its insurance policy would defeat the intent of the contracting parties. Indeed, "[a] contract of insurance should be strictly construed against the insurer and read in favor of coverage in accordance with the reasonable expectations of the insured." *Roland v. Ga. Farm Bureau Mut. Ins. Co.*, 462 S.E.2d 623, 625 (Ga. 1995). Moreover, "[t]he construction of a plain and definite contract of insurance is a matter of law for the court." *Brown v. Peninsular Fire Ins. Co.*, 320 S.E.2d 208, 209 (Ga. Ct. App. 1984). Here, Thiele and CVB operated under the assumption that Thiele was an additional insured under CVB's Selective Way policy—Selective Way cannot, without good reason, void that with various arguments challenging their intent.

## CVB'S MOTION FOR SUMMARY JUDGMENT

In its efforts to obtain summary judgment, CVB argues that there is no admissible evidence to support the claims Travelers asserts against it for contractual indemnity, common law indemnity, breach of contract, or equitable subrogation. [Doc. 61-1, p. 7].

1.     **Contractual Indemnity**

CVB contends that Travelers' contractual indemnity claim fails because it seeks indemnification for Thiele's own negligence. [Doc. 61-1, p. 9]. Well, that's exactly what the contracts between CVB and Thiele require. First and foremost, "[t]he construction of a contract is peculiarly well suited for disposition by summary judgment because, in the absence of an ambiguity in terms, it is a question of law for the court." *Serv. Merch. Co. v. Hunter Fan Co.*, 617 S.E.2d 235, 237 (Ga. Ct. App. 2005). Mainly, with respect to contractual indemnification, CVB contends that it's entitled to summary judgment for the simple fact that there isn't a contract between CVB and Thiele where CVB agreed to indemnify Thiele for something *Thiele* did wrong. [Doc. 61-1, p. 9]. In this case, though, such an agreement *does* exist.

When reviewing a contract of indemnity between parties, Georgia contract law is well established in that it does not allow courts to imply an agreement for one party to indemnify another party's negligence in the absence of express language. *Cent. of Ga. Ry. Co. v. Lester*, 165 S.E.2d 587, 592 (Ga. Ct. App. 1968); *Serv. Merch. Co.*, 617 S.E.2d at 238; *Ryder Integrated Logistics Inc. v. BellSouth Telecomms., Inc.*, 642 S.E.2d 695, 697 (Ga. 2007). Thus, in order for CVB to be legally obligated to compensate for losses caused by Thiele's own negligence, there must be a contract "expressly stat[ing] that [Thiele's] negligence . . . is covered." *Ryder Intergrated*, 642 S.E.2d at 697; *see also CSX Transp.*, 2023 WL 6474710, at *6 (noting that "[b]ased on . . . public policy concern, . . . a party who

was not negligent generally would not be required to indemnify a party who was negligent unless a contract 'explicitly and expressly' required indemnification[]"). The words of a contract are to be "scrutinized closely to discover whether such an intent is actually revealed in them[,] and every presumption is against" the intention to indemnify. *Allstate Ins. Co. v. City of Atlanta*, 415 S.E.2d 308, 309 (Ga. Ct. App. 1992).

First, in the 2008 Indemnification Agreement, CVB says that its requirements are "vaguely state[d]" and argues that it is "only contractually entitled to indemnify for claims" related to employment laws like Title VII, the Fair Labor Standards Act, the Americans with Disabilities Act, and others. [Doc. 61-1, p. 11]. What CVB ignores though is the first part of the 2008 Indemnification Agreement. There, CVB agreed to indemnify, defend, and hold Thiele "harmless from and against ***any and all*** state or federal claims," causes of action, liabilities, fines, judgments, and expenses "***of any nature*** whatsoever" without regard to any partial negligence from CVB. [Doc. 45-3, p. 2] (emphasis added). Sure, indemnification for claims related to employment laws may be more spelled out in the 2008 Indemnification Agreement, but CVB agreed to the entire document—a two-page agreement with sweepingly broad, yet clear and unambiguous language that it would indemnify Thiele against "any and all" claims "of any nature." [*Id.*].

Then, looking to the Master Agreement there is no ambiguity in its terms. Its plain terms clearly obligate CVB to indemnify Thiele. Again, the relevant language

states: "[R]egardless of whether or not the claim, damage, loss, or expense is caused in part by [Thiele][,]" CVB "shall indemnify, defend, and hold [Thiele] harmless[.]" [Doc. 73-9, ¶ 5.11]. Sure, as CVB argues, "[p]ublic policy is reluctant to cast the burden of negligent actions upon those who are not actually at fault[,]" but express and unambiguous language drafted by sophisticated parties—like that used by CVB and Thiele in the Master Agreement—appeases such a concern. [Doc. 61-1, p. 10 (quoting *Ryder Integrated*, 642 S.E.2d at 697)]. "[R]egardless of whether or not the . . . loss . . . [was] caused in part by [Thiele][,]" CVB entered into a contract stating that it "shall indemnify, defend, and hold [Thiele] harmless from and against any claims[.]" [Doc. 73-9, ¶ 5.11]. There just isn't any other reasonable interpretation of those words used in the Master Agreement and those unambiguous words negate any need for principles of contract construction. *Nguyen v. Lumbermans Mut. Cas. Co.*, 583 S.E.2d 220, 223 (Ga. Ct. App. 2003) (holding that "[n]o construction is required or even permissible when the language employed by the parties in the contract is plain, unambiguous and capable of only one reasonable interpretation[]").

CVB also argues that it and Thiele "abandoned their original 2008 'Master Agreement' and had no intent to be bound by it." [Doc. 61-1, p. 12]. In support of this argument, CVB asserts that "neither CVB nor Thiele even remembered the 2008 Master Agreement . . . until Thiele found it in [a] desk . . . nearly seven years after Barnes' death." [*Id.* at pp. 12–13]. However, as discussed above, abandonment of a contract is a

question of fact best left for a jury. *Rivell v. Priv. Health Care Sys., Inc.*, 887 F. Supp. 2d 1277, 1290 n.8 (S.D. Ga. 2012). As more-fully developed above, there are facts in this case that could lead a reasonable jury to reach either conclusion. Therefore, CVB's argument that the Master Agreement was abandoned is not an appropriate basis for summary judgment.

So, on top of CVB agreeing to indemnify Thiele to the extent CVB's negligence caused—"in whole or in part"—any claims, damages, losses, and expenses, CVB further agreed to cover losses "regardless of whether or not" Thiele contributed "in part." [Doc. 73-9, ¶ 5.11]. In the past, Georgia courts have faced similar indemnity clauses. For example, in *National Gypsum of Georgia v. Ploof Carriers Corp.*, the Georgia Court of Appeals found that an indemnity clause's plain terms required a company like CVB to indemnify a company in Thiele's position based on a jury's verdict that found both companies partially at fault. 597 S.E.2d 597, 600 (Ga. Ct. App. 2004). Now, whether CVB contributed to Barnes' death "in whole or in part," of course, plays a pivotal role in its arguments that Travelers cannot prevail on a claim for common law indemnity. However, before delving into the relevant facts surrounding Barnes' death, it's equally as clear that the unambiguous terms of the 2015 Purchase Order also require indemnity.[13] It states:

---

[13] CVB argues, quite incorrectly, that "[n]othing in the 2015 Purchase Order mentions indemnify [sic]." [Doc. 93, p. 6]. CVB then goes on to quote the "only . . . relevant part" of the 2015 Purchase Order is in regard to employee training. [*Id.*]. To make such an assertion completely ignores the "terms and

> **[CVB] hereby indemnifies** and agrees to and agrees to defend, protect and hold harmless [**Thiele**], its officers, directors, employees, agents, servants, successors and assigns **from and against any and all losses, damages, injuries (including death)**, claims, demands, expenses and legal fees, of whatever nature, **arising out of or related to**: (i) breach of any of [CVB's] warranties; (ii) the condition (including, but not limited to, latent and other defects and whether or not discernible or discoverable) of any goods or materials sold hereunder; (iii) **any act or omission of [CVB] (including without limitation negligence), whether or not in the performance of services hereunder**; (iv) any act or omission of any supplier or other subcontractor of [CVB], except only when due to the sole negligence of [Thiele]; (v) the goods and/or materials sold hereunder prior to transfer of title to [Thiele]; (vi) any dispute between [CVB] and any supplier, subcontractor or other third party (regarding for example but not limited to [CVB's] failure to pay any of them, or any lien, claim, security interest or other encumbrance asserted by any of them against [Thiele] or any [Thiele] property); and/or (vii) any actual or alleged failure of [CVB] or any of its suppliers or other subcontractors to comply with any applicable Federal, state or local law, regulation or order.

[Doc. 73-13, p. 5 (emphasis added)].

Even in instances where "language in an agreement may not be sufficiently explicit to indemnify the indemnitee against liability *resulting strictly from its own negligence alone*, such less than explicit language may be sufficient to require indemnification for damages *resulting from the combination of the indemnitee's negligence and the indemnitor's negligence*." *Lawyers Title Ins. Corp. v. New Freedom Mortg. Corp.*, 645 S.E.2d 536, 542 (Ga. Ct. App. 2007) (citation omitted). Applying that principle to this case, when "an indemnification clause requires indemnification of losses that 'arise out

---

conditions" section of the 2015 Purchase Order that includes a separate provision entitled "Indemnity." [Doc. 73-13, p. 5].

of' certain specified events but *does not explicitly mention the indemnitee's negligence*, the clause still requires full indemnification although the indemnitee's negligence may have partially caused the loss." *Id.* at 543 (emphasis added). Thus, the 2015 Purchase Order requires CVB to indemnify Thiele "even if the loss was partially caused by [Thiele's] own negligence." *Id.* Each of the three documents at issue in this case—based on their clear and unambiguous terms—are sufficient to trigger indemnification even if Thiele was negligent to some degree.

### 2.   **Common Law Indemnity**

Generally, as to common law indemnity, CVB contends that it's entitled to summary judgment because there is no admissible evidence in the record that it was negligent, culpable, or vicariously liable for Barnes' death. [Doc. 61-1, pp. 3, 9, 13]. In Georgia, "[a] [party] may be obligated to indemnify another either by terms of a contract or by operation of law, such as where negligence has been imputed to [it] based on another's tort." *Havenbrook Homes, LLC v. Infinity Real Inv., Inc.*, 847 S.E.2d 840, 846 (Ga. Ct. App. 2020).

In its first efforts to obtain summary judgment on Travelers' common law indemnity claim, CVB appears to contend that Travelers' failure to allege that CVB was negligent or vicariously liable in *this* lawsuit or the Pennsylvania state court lawsuit is fatal. [Doc. 61-1, p. 14 ("[Travelers][,] in this case[,] never alleged CVB was negligent, had imputed negligence, or is vicariously liable.")]. In *Havenbrook Homes, LLC v. Infinity*

36

*Real Investments, Inc.*, the Georgia Court of Appeals did, in fact, note that where "the parties did not allege imputed negligence or vicarious liability, there can be no common law claim for indemnity[.]" *Id.* at 486 (citing *Nguyen*, 583 S.E.2d at 224; *see also Hines v. Holland*, 779 S.E.2d 63, 67–68 (Ga. Ct. App. 2015) (recognizing that common law indemnification is a remedy only where there is imputed liability).

From the perspective of the Second Amended Complaint, however, Travelers certainly alleges that "CVB is liable to Thiele for all the claims asserted" in the state court action from Pennsylvania and that "CVB is liable for those funds Travelers paid on behalf of Thiele in defense and settlement" of those claims. [Doc. 45, ¶¶ 69, 72]. CVB, though, argues that although the allegations may be there, Travelers just "improperly surmises [that] 'CVB is liable for those funds paid by [Travelers] on behalf of Thiele[,]'" and it points out that Travelers must "go beyond the pleadings and . . . present . . . specific facts showing a genuine issue for trial." [Doc. 61-1, p. 15 (quoting *Travelers Home and Marine Ins. Co. v. Anglin*, No. 1:19-CV-86 (LAG), 2021 WL 9031161, at *2 (M.D. Ga. Sept. 29, 2021)); *see also* [Doc. 61-1, p. 9 n.53]. Well, Travelers has done that.

The evidence shows that CVB provided Barnes to wash railcars at Thiele's property. [Doc. 61-4, ¶¶ 1, 6]. The parties, however, dispute whether Barnes remained under CVB's supervision or Thiele's. [Doc. 87-1, ¶ 7]. Even though the 2015 Purchase Order provides that CVB's employees—like Barnes—were under CVB's "exclusive control, supervision, and authority" while working at Thiele's facility—it wasn't "that

simple." [Doc. 73-13, p. 5]; [Doc. 73-7, p. 37, Brookins Depo., p. 140:12–18]. "[T]he reality is" that both Thiele and CVB "maintained control over certain aspects about what [Barnes] . . . was doing[.]" [Doc. 73-7, p. 17, Brookins Depo., p. 140:12–18]. The gas monitors belonged to Thiele and Thiele calibrated and provided them to CVB employees for use when entering railcars. [Doc. 87-1, ¶ 8]; [Doc. 73-11, p. 6, Brookins Rule 30(b)(6) Depo., p. 17:22–25]. According to Brookins, if CVB's safety manager witnessed a CVB employee enter a railcar without the use of a gas monitor, CVB's safety manager couldn't even stop that CVB employee from working. [Doc. 73-11, p. 6, Brookins Rule 30(b)(6) Depo., pp. 14:19—17:25]. CVB's safety manager could certainly issue a write-up to a CVB employee failing to properly use a gas monitor, but only Theile, per Brookins' account, could make a CVB employee stop working. [Doc. 73-11, p. 6, Brookins Rule 30(b)(6) Depo., p. 17:18–25]. Now, notwithstanding whatever conclusions may be drawn from Barnes' toxicology testing that revealed recent marijuana use, a jury will, for the reasons discussed below, be tasked with determining whether Barnes received proper training on how to use a gas monitor. [Doc. 73-23, p. 5].

The dueling narrative offered by the parties at summary judgment is a textbook example of when a court can't pick which side it thinks is more credible. *Sconiers*, 946 F.3d at 1263. The 2015 Purchase Order clearly states that "[w]hen working at Thiele" CVB's employees, like Barnes, were to follow Thiele's safety rules—chief among them being Thiele's requirement that he use his gas monitor to test the air quality within the

railcars before entry. [Doc. 73-13, p. 2]; [Doc. 73-19, p. 13, Dunn Depo., pp. 43:19—44:5].

While CVB contends that it trained Barnes to turn on his gas monitor each day before

working, Travelers points out that Brookins merely testified that Barnes "was trained

to" turn on his gas monitor before starting work. [Doc. 61-4, ¶ 11]; [Doc. 87-1, ¶ 11]. In

other words, Brookins never definitively testified *which* company trained Barnes on

how to use a gas monitor. Interestingly, according to multiple instances of Brookins'

testimony from his Rule 30(b)(6) deposition, CVB, at the time of Barnes' death in 2015,

did *not* require its employees to test a railcar's air quality despite testing being a critical

industry rule for work of this nature. [Brookins Rule 30(b)(6) Depo., pp. 28:8–13; 29:13–

18; 34:13–19; 105:24—106:5]. Here's just one example of Brookins testimony on behalf of

CVB:

> Q:    Before the Travis Barnes' incident in 2015, you've told me that CVB
>       ***did not*** require its railcar washers to use an air monitor and test the
>       air inside the railcar before using it; true?
> A:    True.
> Q:    Okay.
> A:    It ***wasn't required*** of us to do that.

[*Id.* at p. 34:13–19] (emphasis added).

Travelers, though, argues that a supervisor for Thiele, Jim Dunn, provided

Barnes with "the on-site training regarding the use of his gas monitor[,]" while still

pointing out Brookins' testimony acknowledging that CVB retained authority to control

Barnes and had a responsibility to ensure that both CVB and Thiele's policies and

procedures were being followed. [Doc. 87-1, ¶ 11]; [Doc. 87-9, p. 9]; *see, e.g.,* [Doc. 73-19,

pp. 6–7, Dunn Depo., pp. 13:6—20:25]. Although it's pretty clear that both CVB and Thiele maintained control over various aspects of Barnes' work, it's less clear where the dividing lines are drawn in order to determine the degree of fault between CVB and Thiele when it comes to his death. Such a factual determination must be (based on this record) made by a jury. Accordingly, summary judgment is inappropriate for Travelers' claim of common law indemnity.

### 3.  **Breach of Contract**

As to Travelers' breach of contract claim against it, CVB contends that it's entitled to summary judgment because it "satisfied its contractual obligation to Thiele by purchasing a commercial general liability . . . policy, under which Thiele could qualify as an additional insured." [Doc. 61-1, p. 18]. Travelers, in its response to that argument, says that CVB's exclusive focus on the fact that it fulfilled *that* contractual obligation is misplaced. Such a narrow focus, according to Travelers, ignores its allegations that CVB also "breached its contracts with Thiele by breaching the warranties within the contracts, and by its supervisory neglect and other wrongful conduct in violation of its contractual obligations." [Doc. 87, p. 22]. These warranties are, of course, contained within contracts between CVB and Thiele, which may raise a question of standing or how Travelers has the ability to even quibble with the enforcement of contracts to which it is not a party. In Georgia, though, insurance companies that have paid the entirety of an insured's loss stand as the real party in

interest. [Doc. 73-1, p. 5 (citing *Arch Ins. Co. v. Bennett*, No. 2:08–CV–0075–RWS, 2009 WL 5175591, at *1–2 (N.D. Ga. Dec. 21, 2009))]. Put simply, Travelers is in Thiele's shoes, and it has the legal right to pursue Thiele's claim for breach of contract on Thiele's behalf. [Doc. 73-1, p. 19 (citing *Renaissance Recovery Sol., LLC v. Monroe Guar. Ins. Co.*, No. CV 1:14-102, 2017 WL 4018861, at *9 (S.D. Ga. Sept. 12, 2017))]. Namely, whether CVB failed to provide workers to Thiele that would follow safety rules and procedures when working on Thiele's premises. [Doc. 73-1, p. 10].

Thus, the specific issues surrounding whether CVB breached its contractual supervisory obligations to Thiele goes hand in hand with others the Court has already determined are ripe for jury determination. Bottom line, the question of whether CVB failed to adequately supervise Barnes to ensure his compliance with Thiele's policies as well as its safety rules and procedures cannot be answered on this record, and summary judgment is likewise inappropriate for Travelers' claim for breach of contract.[14]

### 4. Equitable Subrogation

CVB argues that Travelers cannot maintain a claim for equitable subrogation

---

[14] Selective Way and CVB produced a written opinion authored by Eric S. Hegi and Michael B. Craddock, of Engineering Systems, Inc. ("ESi"). Selective Way and CVB offer Mr. Hegi and Mr. Craddock as experts to opine on Thiele's alleged safety failures and violations of the 1977 Mine Safety and Health Act (the "Mine Act") as administered by the Mine Safety & Health Administration ("MSHA"). [Doc. 69, p. 3]. Arguing that their proffered experts "lack any knowledge, skill, experience, training, or education that would in any way qualify either of them to testify as an expert regarding mining safety practices or MSHA requirements[,]" Travelers seeks to exclude their testimony from the Court's consideration at summary judgment. [*Id.*]. However, given that the factual determinations regarding negligence among CVB and Thiele will be left to a jury, the Court will **DEFER RULING** on Travelers' Motion to Exclude Expert Testimony [Doc. 69].

since CVB was "not a wrongdoer or a tortfeasor[]" and because Travelers "never alleges any wrongdoing by CVB." [Doc. 61-1, pp. 15–16]. First, with respect to its position that it is not a tortfeasor, CVB points to the deposition of Mary Thurston Minor, Travelers' corporate representative. [Doc. 73-4, p. 4, Minor Rule 30(b)(6) Depo., pp. 6:6–13; 8:18–21]. Relying on its interpretation of Minor's testimony, CVB argues that Minor "admitted . . . that CVB did nothing wrong to cause Mr. Barnes's death." [Doc. 61-1, p. 16 (citing [Doc. 73-4, p. 16, Minor Rule 30(b)(6) Depo., pp. 55–56])]. An admission that CVB contends "is fatal to [Travelers'] equitable subrogation claim." [Doc. 61-1, p. 16].

The Court can only assume that CVB makes such an argument since Minor confirmed in her deposition that "Barnes did not follow the safety rules leading up to his death[.]" [Doc. 73-4, p. 16, Minor Rule 30(b)(6) Depo., pp. 56:15–18]; *see also* [Doc. 73-1, p. 10 (Travelers' argument that "CVB's indemnity obligations are triggered by its own independent act, omissions, and/or negligence, including that of its employee, Mr. Barnes[]")]. By CVB's stance, Minor's testimony points blame to Barnes himself and away from CVB. However, therein lies the issue of imputed negligence that looms over this case. To be clear, Minor testified that CVB maintained control of its employees while they were working at Thiele, but such testimony just circles us back to which company—Thiele or CVB—really controlled employees like Barnes and to what extent did either company control Barnes when it came to his compliance with policies and safety rules in place by both Thiele and CVB. *See* [Doc. 73-4, p. 18, Minor Rule 30(b)(6)

Depo., p. 62:13–22].

Then, just by taking a quick glimpse at Travelers' Second Amended Complaint, we know that this isn't a situation where Travelers hasn't alleged any wrongdoing by CVB. To CVB's credit, though, the allegations in Travelers' Second Amended Complaint aren't what matters at this stage. *See* [Doc. 61-1, p. 15]. At summary judgment, the evidence on the record has to be what carries the day for Travelers to reach a jury, not the allegations in its operative complaint. Thus, based on the cursory rundown of the evidence presented in this case discussed above, the issue of whether CVB is a tortfeasor simply can't be resolved at summary judgment.

## TRAVELERS' MOTION FOR SUMMARY JUDGMENT

Travelers argues that it is entitled to summary judgment on its claim of contractual indemnity against CVB based on the indemnity provisions in the 2008 Indemnification Agreement, the Master Agreement, and the 2015 Purchase Order. [Doc. 73-1, p. 6]. Travelers further asserts that CVB is liable under a theory of common law indemnity based on the damages Travelers paid on behalf of Thiele for CVB's own acts or omissions. [Doc. 73-1, p. 12]. However, the reasons for denying CVB's summary-judgment motion on these issues are the same reasons the Court denies Travelers' Motion for Summary Judgment [Doc. 73].

With respect to Travelers' claims against Selective Way—claims for breach of contract, contribution, and equitable subrogation, the Court can only grant summary

judgment as to the issue of whether Selective Way owes coverage to Thiele given that

Thiele qualifies an additional insured under Selective Way's policy. [Doc. 73-1, pp. 12–

19]. As discussed above, the timecards signed between CVB and Thiele in connection

with the 2015 Purchase Order trigger additional insured coverage with Selective Way's

policy. *See* [Doc. 86, pp. 20–22]. Now, the question just becomes: How much?

Let's start with the insurance policy Selective Way issued to CVB. It reads:

> **Primary and Non-Contributory Provision**
> The following is added to Paragraph **4. Other Insur-
> ance, b. Excess Insurance** under **SECTION IV -
> COMMERCIAL GENERAL LIABILITY CONDITIONS:**
> This insurance shall be excess with respect to any
> person or organization included as an additional insured
> under this policy, any other insurance that person or
> organization has shall be primary with respect to this
> insurance, unless:
> (1) The additional insured is a Named Insured under
> such other insurance;
> (2) You have agreed in a written contract, written agree-
> ment or written permit to include that additional
> insured on your General Liability policy on a primary
> and/or non-contributory basis; and
> (3) The written contract or written agreement has been
> executed (executed means signed by the named
> insured) or written permit issued prior to the "bodily
> injury" or "property damage" or "personal and adver-
> tising injury".

[Doc. 32-3, p. 219].

The 2015 Purchase Order is that written contract where CVB agreed to include

Thiele as an additional insured on its policy from Selective Way "on a primary . . .

basis[.]" [*Id.*]. Pursuant to the 2015 Purchase Order, CVB had to "keep" comprehensive

general liability insurance and excess liability insurance "in force" at all times during which work under the 2015 Purchase Order was being carried out. [Doc. 73-13, p. 5]. Selective Way required the 2015 Purchase Order, and the 2015 Purchased Order required coverage for Thiele—the additional insured. Per the terms of the 2015 Purchase Order, the "comprehensive general liability insurance" portion was to cover bodily injury and property damage "with limits of no less than $1 million per incident and $2 million in the aggregate[.]" [*Id.*]. The "excess," or umbrella, portion had limits "of $2 million per occurrence." [*Id.*].

Notwithstanding the existence of additional insured coverage, Selective Way, however, argues that the extent of its liability is subject to a pro rata share with Travelers because its insurance and the insurance Travelers directly issues to Thiele provides overlapping coverage. [Doc. 62-1, p. 20 (quoting *Nat'l Cas. Co. v. Ga. Sch. Bds. Ass'n–Risk Mgmt. Fund*, 818 S.E.2d 250, 253 (Ga. 2018))]. Bearing in mind any applicable methods of sharing, here's the relevant portions of Travelers' policy for Thiele's insurance:

> (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.
>
> . . .
>
> **PROVISIONS**

45

COMMERCIAL GENERAL LIABILITY CONDITIONS
(Section **IV**), Paragraph **4. (Other Insurance)**, is
amended as follows:

**1.**   The following is added to Paragraph **a. Primary
Insurance:**

However, if you specifically agree in a written con-
tract or written agreement that the insurance pro-
vided to an additional insured under this
Coverage Part must apply on a primary basis, or
a primary and non-contributory basis, this insur-
ance is primary to other insurance that is avail-
able to such additional insured which covers such
additional insured as a named insured, and we
will not share with that other insurance, provided
that:

**a.**   The "bodily injury" or "property damage" for
which coverage is sought occurs; and

**b.** The "personal injury" or "advertising injury" for
which coverage is sought arises out of an of-
fense committed

subsequent to the signing and execution of that
contract or agreement by you.

**2.**   The first Subparagraph (2) of Paragraph **b. Ex
cess Insurance** regarding any other primary in-
surance available to you is deleted.

**3.**   The following is added to Paragraph **b. Excess
Insurance**, as an additional subparagraph under
Subparagraph **(1):**

That is available to the insured when the insured
is added as an additional insured under any other
policy, including any umbrella or excess policy.

[Doc. 62-4, pp. 24, 40]. To an extent, yes. As Selective Way argues, Thiele is technically

insured by both Selective Way and Travelers, but that's only because Thiele wanted its

own safety net. Thiele is certainly allowed to have its own additional coverage through

Travelers, and even though Selective Way's policy says that its "insurance shall be

excess" it—as the primary insurance—is "first in the pecking order" and takes priority over Travelers' policy. *See Great Am. Ins. Co. v. Allied World Assur. Co.*, No. 22-12496, 2023 WL 3736878, at *2–4 (11th Cir. May 31, 2023). Here's why the Selective Way policy is primary.

"The interpretation of an insurance policy is subject to the relevant general rules of contract construction, the cardinal rule being to determine and carry out the intent of the parties." *Nat'l Cas. Co.*, 818 S.E.2d at 253 (citing *Bell v. Liberty Mut. Fire Ins. Co.*, 734 S.E.2d 894, 898 (Ga. Ct. App. 2012)). When determining that intent, courts are "to consider the insurance policy as a whole, and a preferred construction will give effect to each provision, attempt to harmonize the provisions with each other, and not render any of the policy provisions meaningless or mere surplusage." *Nat'l Cas. Co.*, 818 S.E.2d at 253 (citing *York Ins. Co. v. Williams Seafood of Albany, Inc.*, 544 S.E.2d 156, 157 (Ga. 2001)). Lastly, "[t]he policy should be read as a layman would read it[,]" and exclusions are to be "strictly construed against the insurer and in favor of coverage." *York Ins.*, 544 S.E.2d at 157.

Selective Way contends that none of the documents relevant to this case specifically "require [additional insured] coverage on a primary basis." [Doc. 62-1, p. 21]. But, when you read the 2015 Purchase Order, its language brings CVB and Thiele's intent front and center. Again, the 2015 Purchase Order required CVB to "keep in force" both comprehensive liability insurance ***and*** excess/umbrella liability insurance. [Doc.

73-13, p. 5]. The Court simply agrees with Travelers on this issue.

Given that the 2015 Purchase Order calls for both comprehensive liability insurance **and** excess insurance, Selective Way's "asserted interpretation of the contract would create a non-sensical redundancy in which the contract would call for excess and excess insurance within the same sentence." [Doc. 86, p. 22]. Logically read, the "comprehensive general liability insurance" required by the 2015 Purchase Order has to be primary. [Doc. 73-13, p. 5]. To take Selective Way's interpretation would mean that CVB had to get excess coverage twice, and that just makes little sense. The 2015 Purchase Order used two different terms—"comprehensive general liability insurance" and "excess/umbrella"—so, both of them must mean something different. [*Id.*]. After all, "[i]t is a cardinal rule of construction that a contract should be construed in a manner that gives effect to all of the contractual terms." *Ins. Co. of Pa. v. APAC-S.E., Inc.*, 677 S.E.2d 734, 739 (Ga. Ct. App. 2009). "Put another way, the parties would not have used two different terms in short sequence within the same paragraph to mean the exact same thing." *Id.*

As far as the 2015 Purchase Order is concerned, it can only be read to require Thiele to be an additional insured for commercial general liability coverage on a primary basis. Selective Way's insurance policy and Travelers' insurance policy, do not, as Selective Way contends, cancel each other out. [Doc. 62-1, p. 22]. So, that brings us back to the question of: How much? Under the facts of this case, since the 2015 Purchase

48

Order required "no less than $1 million per incident and $2 million in the aggregate" for "comprehensive general liability insurance" and "$2 million per occurrence" for "excess" coverage, CVB was required to name Thiele as an additional insured for $3 million in liability coverage. [Doc. 73-13, p. 5].

## <u>CONCLUSION</u>

A jury will have plenty of issues to decide in this case. This case simply isn't one that a court can decide on its own because a jury will have to weigh conflicting evidence, assess the credibility of witnesses, and hash out exactly what happened—everything that a court cannot do when considering dueling narratives presented for summary judgment.

To put a bow on it, the Court **DENIES** CVB Industrial Contracting, Inc.'s Motion for Summary Judgment [Doc. 61], **DENIES** Selective Way Insurance Company's Motion for Summary Judgment [Doc. 62], and **GRANTS in part** and **DENIES in part** Travelers Property Casualty Company of America's Motion for Summary Judgment [Doc. 73]. The Court sets this case for trial on January 2, 2024, at 9:00 a.m., in Macon, Georgia. The Court will soon order the parties to develop a Proposed Pretrial Order.

**SO ORDERED**, this 6th day of October, 2023.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**